Filed 8/5/25  P. v. Bridges CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>THOMAS BRIDGES,<br><br>     Defendant and Appellant. | B337333<br><br>(Los Angeles County<br>Super. Ct. No. BA240172) |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Thomas Bridges participated in an armed robbery during which his accomplice shot and killed a security guard. A jury convicted Bridges of first degree murder with a true finding on a special circumstance allegation that he committed the murder during a robbery. Thereafter, he petitioned for resentencing under Penal Code section 1172.6,[1] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court denied Bridges's petition, finding that he was a major participant in the felony who acted with reckless indifference to human life. Bridges now appeals the trial court's order denying his petition. Because sufficient evidence supports the trial court's order, we affirm.

## BACKGROUND

I.    The robbery and murder

Bridges was tried with Claudell Hatter, Rollin Denem, and Wardell Joe for robbery and murder.[2] Based on our review of the trial transcripts, we find the opinion affirming as modified Bridges's judgment of conviction on direct appeal (*People v. Bridges et al.* (Jan. 30, 2006, B176263) [nonpub. opn.]) to be an accurate summary of evidence admitted at the joint trial. We therefore quote its recitation of the background, with additions noted in brackets. (§ 1172.6, subd. (d)(3); see *People v. Lewis*

---

[1]    All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2]    Jesse Singleton and Reginald Howard were tried together before separate juries.

(2021) 11 Cal.5th 952, 972 [appellate opinion is generally part of record of conviction in § 1172.6 proceedings].)

"1. The prosecution's evidence.

"a. Overview.

"On November 3, 1998 [at about 11:00 a.m.], appellants Bridges, Denem, Hatter and Joe, assisted by Reginald Howard, Jesse Singleton, Amar Mobley and Tiasha Croslin, committed an armed robbery at the Big Saver Foods Market near Slauson and Compton Avenues in Los Angeles. Six of the eight robbers belonged to the 69 East Coast Crips. Bridges belonged to a related gang, West Covina Neighborhood Crips, and Croslin, Bridges's girlfriend, formerly belonged to a gang in San Diego. In the course of the robbery, Howard shot and killed the security guard, Juan Hernandez. The robbers also took Hernandez's gun. Bridges robbed a cashier at gunpoint, obtaining money and food stamps which were divided at Hatter's home after the robbery. Leonard Jackson, a gang associate of the robbers, arrived at Hatter's home just as the robbers returned from the crime scene. Jackson shared in the proceeds of the robbery.

"Appellants were charged with first degree murder and robbery of Hernandez in counts one and two, and robbery of the cashier in count three.

"Croslin and Jackson testified against appellants at trial. Before detailing their testimony, we summarize the testimony of the eyewitnesses and the investigation of the offense.

"b. Eyewitness testimony.

"Gilbert Davis lived down the street from B[ig] Saver Foods Market. On November 3, 1998, Davis saw a Buick Regal, an Oldsmobile Cutlass and a Pontiac Trans Am in front of his home

3

and became suspicious.  From the porch of his home, Davis saw four males enter the market.  Davis and some of his friends walked toward the market.  The driver of the Cutlass, who was alone in the car, looked straight ahead.  Davis returned home and called 911.  Davis then saw someone 'hop in[to] the Cutlass, then they took off.'

[Jesus Molina was working at the market.  Bridges and possibly a second man asked him where the soft drinks were.  A minute or less later, Molina heard what he thought was a balloon popping from the front of the market, where the security guard usually positioned himself.  Sixty to 90 seconds later, Molina heard a gunshot from the front of the store.  Molina, a customer, and the customer's child fled out the back.]

[Jose Lopez was working near the rear of the market when he noticed three men pass by repeatedly.  Suspicious, Lopez went upstairs to get a better view, but he lost sight of them.  Lopez then heard a gunshot.  He went downstairs and saw a man pointing a gun at Marissa Ayon, a cashier at the market.  Lopez said that the man was "threatening the girl" and there were customers with a child nearby.  Lopez told the customers to flee through the back of the market.]

"Market employee Carlos Guzman saw three males looking around the store.  One of the males[, Denem,] wore a hat and had long curly hair.  He had a handgun and ordered everyone to get down, then pointed the gun at the ceiling and fired one shot.  [One to two other individuals were in front of the cash registers.]  Guzman heard another shot about thirty seconds later.

"[ ] Ayon [ ] saw the security guard struggling with two males.  [A third man held a gun nearby.]  After Ayon heard a shot, one of the males ran from the market.  Ayon ran to the

manager's office but the manager [and bookkeeper] locked the door before she could enter.  An armed male [told Ayon to 'Get your ass over here'] and took Ayon at gunpoint from the door of the office to the cash registers and forced her to empty the contents of two registers into a plastic bag.  [Ayon could see Hernandez on the ground.]

"c. Investigation.

"The crime went unsolved for two years until Jackson, who was serving a 17-year federal drug term, wrote a letter to the U.S. Attorney in December of 2000 offering to assist in the investigation of this case in the hope of obtaining a reduction of his term.  In March of 2001, Los Angeles Police Detective Joseph Martinez interviewed Jackson at a federal correctional facility in Victorville.  Jackson identified photographs of six of the participants in the robbery and offered the name of the seventh, Denem.

"In April of 2001, Detective Martinez showed photographic lineups to the market employees.  Jose Molina identified Singleton and Bridges; Jose Lopez identified Howard; Haydee Penate and Carlos Guzman identified Singleton.  Ayon, the cashier, failed to identify anyone in the photographic lineups.  However, toward the close of Ayon's trial testimony, she indicated that, after looking at Bridges, he appeared similar to the individual who directed her at gunpoint to empty the cash registers.

"On May 30, 2001, Detective Martinez re-interviewed Davis, the witness who lived down the street from the market, at Men's Central Jail.  [Fn. omitted.]  Davis identified Hatter and Croslin in photographic lineups and at trial as the individuals he

5

had seen in the Regal outside the market and identified Joe as the driver of the Cutlass.

"In May of 2001, Martinez interviewed Croslin who was in federal custody in Connecticut in connection with a 1999 bank robbery conviction for which Croslin had been sentenced to a term of five years and three months. Croslin admitted her role in the Big Saver Food case and identified the participants. Croslin initially faced a term of life without the possibility of parole for her involvement in the robbery. However, Croslin pleaded no contest to one count of voluntary manslaughter and two counts of robbery in exchange for a prison term of 12 years and her truthful testimony in this case.

"d. Croslin's testimony.

"At trial, Croslin testified that in November of 1998, she lived with Bridges on 68th Street in Los Angeles. Jackson lived in the house in front of them. Through Bridges, Croslin met Hatter and Denem, both of whom were members of the 69th Street Crips. Hatter's nickname was Doughboy and Denem's nickname was [ ] Baby Doughboy, indicating the two had a close relationship.

"On the morning of November 3, 1998, Bridges and Croslin drove separately from their home to Hatter's home on 84th Street where all four appellants, plus Singleton, Howard and Mobley, began to discuss a robbery. During the trial, Croslin specifically identified appellants Hatter, Bridges, Denem and Joe. Croslin also identified Singleton, Howard and Mobley, who were brought into the courtroom for that purpose. Hatter said he needed money to get a car out of impound. When the conversation ended, Bridges told Croslin to get into a Regal with Hatter. Hatter drove the Regal to the B[ig] Saver Foods Market. Croslin

6

understood they were going to commit a robbery. After Hatter and Croslin entered the market, Hatter said, 'This is where we're going to hit.' Croslin was surprised because there was no bank in the market. Hatter and Croslin made a purchase, then left the store. They drove past a Cutlass driven by Joe and a Trans[ ]Am driven by Mobley parked on 58th Street. Shortly thereafter, Hatter and Croslin drove past the market and saw individuals running from it.

"After the robbery, the entire crime team returned to Hatter's residence. Howard was pacing and repeatedly said, in a scared manner, 'I [shot him].' Bridges and Hatter loudly urged Howard to calm down. They divided the money and food stamps obtained in the robbery and gave some food stamps to Jackson, who was wanted by his parole officer. After the property had been divided, everyone left.

"Croslin did not learn of the death of the security guard until later when she saw the news on television. When Bridges returned home that evening, Croslin confronted him. Bridges told her, 'Howard was tussling with the security guard and shot him.' Bridges indicated his role was to get the money from the safe in the office with Denem or Singleton, and Howard's job was to distract the security guard. Bridges said Denem wore a disguise of a hat and a curly wig and that Hatter's purpose in driving along 58th Street was to indicate to the others it was okay to rob the market. [Bridges showed Croslin food stamps and money from the robbery. He told her that the security guard's gun was taken, but he did not say who took it.]

"Croslin was arrested two days after the robbery and remained in custody on a federal bank robbery charge until the time of her testimony in this case.

7

"e. Jackson's testimony.

"Jackson was serving 17 years in federal custody for a conviction of distribution of cocaine he suffered in October of 2000. Jackson also had a prior conviction of robbery in 1991. In 1998, Jackson associated with Hatter, Denem, Joe and Bridges. They all were members of the 69 East Coast Crips except Bridges who was a member of the West Covina Neighborhood Crips. They all frequented Hatter's home on 84th Street or Jackson's home on 68th Street. Jackson sold the Cutlass involved in this case to Joe.

"On November 3, 1998, Jackson was at Hatter's home when Hatter, Bridges, Denem, Joe, Howard, Singleton, Mobley and Croslin quickly exited cars and entered the house. Denem had a hat and a wig. Once inside, they argued. Hatter asked where the money was and Bridges said they only got food stamps. Bridges said they would have gotten more if Howard was not 'so trigger happy.' Howard was 'jumping around real jittery like, real nervous.' They divided food stamps among themselves and gave Jackson some. When they saw a news report[ ] of the robbery, Bridges and Denem said police sketches of the suspects did not look like them. While they watched the news, Denem laughed because the sketches depicted him as having long hair. Hatter told Singleton to get rid of the Trans Am.

"Two days after the robbery, Jackson was arrested for violating parole. Jackson has been in federal custody since March of 2000. He contacted the United States Attorney's office about cooperating in this case in December of 2000 and was interviewed by Detective Martinez in March of 2001. Approximately five months after that interview, Bridges and Jackson were incarcerated together in Victorville. Bridges told

8

Jackson that detectives had spoken to him about the Big Saver Foods robbery. Bridges then began to relate details of the crime to Jackson. Bridges said Hatter and Croslin entered the store first to 'check the move out[.]' Bridges said he and Denem intended to force the manager to open the safe at the back of the store but the manager locked himself in a room. Bridges heard a shot, then ran with Denem to the front of the market and saw that Howard and Singleton already had fled. Bridges then took food stamps from the cash register. Bridges said Howard had a .45 caliber handgun." (*People v. Bridges et al.*, *supra*, B176263.)

II.     Verdict and sentence

In 2004, a jury convicted Bridges of special circumstance murder (§§ 187, subd. (a), 190.2, subd. (a)(17); count 1) and of second degree robbery (§ 211; counts 2 [Hernandez] & 3 [Ayon]) with true findings on principal gun use (§ 12022.53, subds. (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)) allegations.[3] That same year, the trial court sentenced Bridges on count 1 to life without parole plus 25 years to life for the gun enhancement. The trial court imposed concurrent sentences on counts 2 and 3.

III.    Postconviction petition for resentencing

In 2023, Bridges petitioned for resentencing under section 1172.6. After receiving briefing, the trial court held an evidentiary hearing on March 25, 2024.

At the outset of the evidentiary hearing, the trial court stated it had read the petition, the parties' briefs, and the trial and court transcripts, which it admitted into evidence. The

---

[3]     The jury found the gang allegations true as to counts 1 and 3 only.

9

parties did not introduce any new or additional evidence.[4] After hearing the parties' arguments, the trial court found that Bridges heard a gunshot, which would suggest that either "someone got shot or got shot at." Continuing with the robbery after hearing the gunshot was "extremely important" to the trial court to determining the reckless indifference prong of the analysis. The trial court found this case "extremely analogous" to *People v. Owens* (2022) 78 Cal.App.5th 1015 (*Owens*), where the defendant and accomplices entered a credit union, the defendant used a gun to control customers and employees to facilitate the robbery, the defendant heard shots fired by an accomplice, and the defendant ran from the credit union, passing the victim's body. Finally, the trial court considered Bridges's age of 20 years when he committed the crime, but found no evidence that his youth was a mitigating factor.

Accordingly, the trial court denied the motion. This appeal followed.

**DISCUSSION**

I.   Senate Bill No. 1437 and standard of review

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and subsequent related legislation limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in

---

[4]     Bridges submitted a "declaration of facts," but the trial court did not consider it.

a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)  As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, at p. 842.)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile*, *supra*, 10 Cal.5th at p. 847.)  A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under the current law.  (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory.  (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

11

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)  Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.)  We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence.  (*Owens*, *supra*, 78 Cal.App.5th at p. 1022.)  We do not resolve credibility issues or evidentiary conflicts.  (*Ibid.*)  Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.  (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

II.    *Banks/Clark* factors

The trial court found that Bridges was a major participant in a felony who acted with reckless indifference to human life under current law, and therefore he was not entitled to resentencing under Senate Bill 1437.  This area of law has its genesis in two United States Supreme Court cases:  *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when

12

the murder was committed, and had no intent to kill.  (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona*, *supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison.  The defendants gave them guns, and the group later kidnapped a family of four.  The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager.  (*Id.* at pp. 139–141.)  The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life."  (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements.  *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant."  The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the

13

actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*.  Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' "  (*Clark*, *supra*, 63 Cal.4th at p. 616.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component.  (*Ibid.*)  Subjectively, the defendant must consciously disregard risks known to him.  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' "  (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) [summarizing *Clark* factors].)

In evaluating the sufficiency of evidence to support a trial court's finding that the *Banks/Clark* factors are established, no one factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) Thus, "[w]here a defendant is not the actual killer or an aider and abettor with intent to kill, Senate Bill No. 1437 tasks us to distinguish between defendants who participate in a violent felony posing only the foreseeable risk of death inherent in any such crime (who are not liable for deaths that may occur during its commission) from those who knowingly engage in criminal activities known to carry a grave risk of death (who are liable)." (*People v. Emanuel* (2025) 17 Cal.5th 867, 889 (*Emanuel*).)

III.  Sufficiency of the evidence Bridges was a major participant in the felony who acted with reckless indifference to human life

Bridges concedes he was a major participant in the robberies.  He instead argues that there is insufficient evidence he acted with reckless indifference to human life.  Cognizant that the *Banks* and *Clark* factors overlap, we therefore focus our analysis on that prong of the inquiry.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 615 [significant overlap exists between factors establishing two prongs].)

A.  *Bridges's use of and knowledge that guns would be used*

Bridges was armed with a gun, and at least two of his accomplices, Denem and the actual killer, were armed with guns.

15

The evidence further establishes a reasonable inference that Bridges knew his accomplices were armed, as the robbery was carefully planned. Moreover, not only did the robbers possess guns, but they used them: Denem fired his gun at the ceiling, the actual killer shot Hernandez, and Bridges forced Ayon to open the cash register at gunpoint.

While the mere fact a robbery involved a gun is insufficient by itself to support a finding of reckless indifference to human life (*Clark*, *supra*, 63 Cal.4th at p. 617), the presence of at least three lethal weapons *and* that they were violently used are factors relevant to the required mens rea and weigh in favor of the trial court's finding, even if they are not dispositive. (See generally *Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life]; see, e.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [personally wielding gun during robbery reflects reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during bank robbery].)

B.   *Bridges's efforts to minimize risks of violence*

The evidence about this factor is nuanced. There was evidence suggesting that the robbery plan did not include using lethal force. (Compare *People v. Williams* (2015) 61 Cal.4th 1244, 1281–1282 [defendant acted with reckless indifference to human life where he instructed fellow gang members carrying out carjackings to shoot resisting victims].) When the robbers regrouped at the house after the robbery, Howard was pacing back and forth, scared, repeating, " 'I shot him.' " There was a

16

"lot of arguing," and people told Howard to calm down and to shut up. Also, Jackson testified that after the men learned someone had died, they were "just saying it was messed up." Bridges was unhappy that Howard shot Hernandez, saying that they would have gotten more money had Howard not been "trigger happy." Thus, the robbers' reactions, including Bridges's, to the murder were ones of upset that it precluded them from getting more money. While callous, their reaction to Hernandez's murder shows that lethal force was unplanned.

However, other evidence shows that Bridges and his accomplices planned the robbery in a way that greatly heightened the risk of violence. They planned the armed robbery for a time, late morning, when customers would certainly be shopping, and at a place, a market, where shoppers would be present and multiple employees would be working. (Compare with *Emanuel*, *supra*, 17 Cal.5th at p. 887 [defendant minimized risk of violence where crime occurred at 3:00 p.m. on residential street adjacent to a park where witnesses might be present to observe, and robbery plan did not include using weapons]; *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence]; *Scoggins*, *supra*, 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].)

Bridges and his accomplices had multiple guns, planned to use them, committed the robbery in an enclosed space where exits might not be apparent or available, and planned to force the manager to open the safe. Significantly, Bridges told Croslin that Howard was supposed to distract the security guard; therefore, they planned to somehow engage the armed Hernandez, a plan clearly fraught with the potential for violence. Bridges also planned to force the manager to open the safe, but the manager

17

escaped into the office and locked the door before Bridges could catch him. Bridges therefore planned to restrain the manager, inferentially at gunpoint, but only the manager's quick action prevented Bridges from putting his plan into action. Also significant is that Bridges walked around the market and, it is reasonable to infer, saw that multiple employees, customers (including children), and the armed Hernandez were present. (See, e.g., *Owens*, *supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [defendant did not plan robbery of store for an off-peak time to minimize chance of violent conflict].) A plan to have armed men enter a potentially busy market guarded by an armed security guard is one designed to heighten, not minimize, the risk of violence. Thus, notwithstanding evidence that the original plan did not include shooting Hernandez, this factor weighs in favor of a reckless indifference finding.

C.   *Bridges's presence at crime scene and opportunity to restrain crime*

Where there is no evidence lethal force was part of the agreed-upon plan, absence from the scene "may significantly diminish culpability for death." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5.) Thus, under some circumstances, a defendant's absence from the murder scene or inability to restrain the accomplice can weigh against a reckless indifference finding. (See, e.g., *Scoggins*, *supra*, 9 Cal.5th at pp. 672, 679 [where defendant was not at murder scene, but was at nearby gas station, and there was no evidence plan involved use of weapons, reckless indifference finding not supported]; *People v. Ramirez*

18

(2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].)

Here, unlike the defendants in *Scoggins* and *Clark* who were not in the same building when the shootings happened, Bridges was in the market and, inferentially, nearby, when Denem fired the first gunshot into the ceiling. Undoubtably, Bridges heard that first gunshot. According to witnesses, 30 to 90 seconds elapsed from that first gunshot to the second gunshot that killed Hernandez. Also, Bridges told Croslin the evening of the shooting that Howard had tussled with Hernandez and shot him. Although Bridges's statement does not clearly establish he saw his accomplices fighting with Hernandez as opposed to being told about it, the statement nonetheless supports an inference that Bridges saw Howard fighting with Hernandez and therefore was present when Hernandez was shot.

In any event, what happened here is similar to the events in *In re McDowell* (2020) 55 Cal.App.5th 999. In that case, McDowell and an accomplice planned to rob a drug dealer. (*Id.* at p. 1005.) McDowell entered the victim/drug dealer's home with a knife, and his accomplice entered shortly after with a gun, which he pointed at the drug dealer and two others in the house. When the drug dealer denied having anything, the accomplice fired a warning shot into the floor. The victim taunted the accomplice to kill him, but the victim's companion asked the accomplice not to hurt them. A struggle broke out, McDowell was knocked to the ground, and the accomplice shot and killed the victim. A witness

19

estimated that only a few seconds elapsed between the first and second gunshots. (*Ibid.*)

In discussing whether McDowell took steps to prevent the violence, the court observed that McDowell saw his accomplice fire a warning shot, a sure indication of the accomplice's willingness to engage in lethal violence. (*In re McDowell, supra*, 55 Cal.App.5th at p. 1014.) Then, when the victim taunted the accomplice to shoot him, McDowell remained silent, even as the victim's companions intervened, verbally and physically. (*Ibid.*) The court found that McDowell had a "brief but critical opportunity" to say or do something to deescalate the situation, but he did nothing. (*Ibid.*)

Similarly here, Bridges heard that first shot. As the trial court said, Bridges then knew that either a gun had been discharged or someone had been shot. Either way, that first gunshot unmistakably indicated Bridges's accomplice's willingness to use lethal violence. (See, e.g., *In re McDowell, supra*, 55 Cal.App.5th at p. 1014; *Owens, supra*, 78 Cal.App.5th at p. 1024 [accomplice's proclivity for violence became evident during robbery when he shot a victim immediately on entering bank].) Although Bridges had a brief amount of time (30 to 90 seconds according to witnesses) to deescalate the violence, there is no evidence he did anything, like call out to his accomplices to stop, tell people in the store to leave, or even leave himself, which could suggest a disavowal of further violence. (See generally *Clark, supra*, 63 Cal.4th at p. 619 [proximity to murder and events leading to it "may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps"]; see, e.g., *Emanuel, supra*, 17 Cal.5th at p. 891 [when victim resisted, defendant said, " 'let's go,' "

evidencing intent to abandon plan rather than resort to greater violence].)  Instead, Bridges used the opportunity to point a gun at Ayon and to make her empty multiple cash registers, all while Hernandez lay dying nearby.

Thus, while the events may have unfolded rapidly, there is evidence that Bridges had a meaningful opportunity to tamp down greater violence.  (See generally *Emanuel*, *supra*, 17 Cal.5th at p. 892 [where crime unfolds quickly, failing to restrain cohort may not weigh in favor of reckless indifference finding unless there is some evidence defendant had meaningful opportunity to restrain cohort].)  A meaningful opportunity "requires some awareness of the risk of impending lethal violence and time to react."  (*Ibid.*)  As in *McDowell*, the warning shot fired by Denem provided Bridges with notice of impending violence and a brief but meaningful opportunity to restrain his cohort.  Sufficient evidence shows that Bridges did not avail himself of that opportunity.  This factor therefore weighs in favor of the trial court's reckless indifference finding.

D.    *Duration of crime and interaction between perpetrators and victims*

Generally, the longer a crime lasts, the opportunity for violence increases, especially when victims are held at gunpoint or restrained for prolonged periods.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  "A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence."  (*Emanuel*, *supra*, 17 Cal.5th at p. 886.)  In this case, it is unclear how long the robbery lasted.  But it was of some duration because the robbers cased the market, tried to restrain the manager, fought with Hernandez, and forced Ayon to empty multiple cash registers.

21

As for Bridges's interaction with the victims, he forced Ayon at gunpoint to open the cash register. Pointing a gun directly at a victim is an implicit threat to shoot the victim. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 273.) Therefore, although it is unclear how long the events lasted, it was enough time for Bridges to case the store, pursue the manager, and restrain at gunpoint Ayon. This factor, especially given the restraint of victims at gunpoint, therefore weighs in favor of the trial court's finding.

E.    *Bridges's knowledge of his confederate's propensity for violence or likelihood of using lethal force*

There is no evidence Bridges knew before going into the store that any of his accomplices had a propensity for violence, other than that the participants were gang members. However, mere comembership in a gang does not by itself establish knowledge of a propensity for violence. (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence they had participated in shootings, murder, or attempted murder].)

Even so, once the robbers were in the market, one of them fired a gunshot into the ceiling near the front of the store. Although this could have been a warning shot to customers and employees to get down, it was an extremely reckless and violent act. On hearing the gunshot, Bridges should have been alerted to his accomplice's willingness to commit a violent act, if not a propensity for it. (See, e.g., *Owens, supra*, 78 Cal.App.5th at p. 1024 [accomplice's propensity for violence became "evident" during robbery when accomplice fired gun]; see *People v. Nieber* (2022) 82 Cal.App.5th 458, 479 [although Nieber did not know

22

about cohorts' likelihood of killing, "he was aware they brought a weapon, which they were using"].) Yet, there is no evidence Bridges then tried to tamp down the violence or leave the market; instead, he forced Ayon at gunpoint to open the cash register. This factor therefore supports the reckless indifference finding.

### F.  *Postshooting conduct*

Whether a defendant's postshooting conduct shows a reckless indifference to human life "is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed. Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability." (*Emanuel*, *supra*, 17 Cal.5th at p. 895.)

Here, there was evidence that Bridges was indifferent to the risk that someone could be killed during the robbery. Not only did Bridges fail to aid Hernandez, Bridges seized the opportunity of Hernandez's disablement to force Ayon at gunpoint to open the cash registers. In response, Bridges suggests that he did not see Hernandez or did not know that he was seriously wounded. However, Bridges heard the gunshots. And Ayon could see Hernandez. It is therefore reasonable to infer that Bridges could also see the bleeding Hernandez. Yet, Bridges did not help Hernandez, and he prevented Ayon from helping him by holding her at gunpoint. (Compare with *Emanuel*, *supra*, 17 Cal.5th at p. 894 [defendant took no action to interfere with victim's ability to receive aid].) Such callous behavior supports the reckless indifference finding. (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas*,

23

*supra*, 56 Cal.App.5th at p. 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)

    G.    *Bridges's youth*

Bridges, who was 20 years old when he committed the crimes, contends that the trial court refused to consider his youth as a mitigating factor because he was not a juvenile. (See generally *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 987 [defendant's youth is relevant factor to consider in *Banks/Clark* analysis]; *In re Moore*, *supra*, 68 Cal.App.5th at p. 454 [same].) This contention is incorrect.

At the evidentiary hearing, the trial court said it was convinced beyond a reasonable doubt that Bridges was a major participant in the robberies who acted with reckless indifference to human life. It then added, "That doesn't end the inquiry. The defendant was 20 years of age at the time of this offense, although he was not a juvenile. However, there is no indication, and there is absolutely no evidence that the defendant's youth was mitigating in this area, that the planning and participation was evident. There was no peer pressure, there was no indicia that you played such a part that it would degenerate from the defendant's being a major participant, or acting with reckless indifference to human life."

To the extent Bridges argues that the trial court believed that only a defendant's juvenile status can be a mitigating factor, that is not what the trial court said. The trial court simply observed that, at 20 years of age, Bridges was not a juvenile (a person under 18 years old). Further, even though Bridges was not a juvenile, the trial court found that his youthful age was relevant. Even so, there was no evidence about how, if at all, his

age or background played a role in his behavior that day. (Compare with *People v. Keel* (2022) 84 Cal.App.5th 546, 550, 562 [evidence that 15-year-old defendant was especially vulnerable to outside pressures showed he lacked requisite mens rea].)  The record therefore shows that the trial court understood that Bridges's youth was a relevant factor and considered it, but found there was no evidence it contributed to his actions.

      H.    *The totality of the circumstances*

In evaluating the sufficiency of this evidence to support the trial court's finding, we are mindful that no one *Clark* factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.)  Rather, we evaluate the factors under the totality of the circumstances to determine Bridges's place on the culpability spectrum.  (*Scoggins*, *supra*, 9 Cal.5th at p. 675.)  Here, Bridges knew guns would be used, he planned to use a gun to force the manager to open the safe, he planned to have his accomplice distract an armed security guard, he failed to tamp down the violence after hearing Denem's first gunshot, he forced Ayon at gunpoint to open the cash registers as Hernandez lay dying, and he callously disregarded Hernandez and prevented Ayon from helping him.  Thus, notwithstanding evidence that the robbery plan did not include using lethal violence, the totality of the circumstances supports the trial court's reckless indifference finding.

25

## DISPOSITION

The order denying Thomas Bridges's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


EGERTON, J.


ADAMS, J.